Hart Robinovitch
ZIMMERMAN REED LLP
14648 N. Scottsdale Rd.
Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
hart.robinovitch@zimmreed.com

*Attorney for Plaintiff*

*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Ernest Lee, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>The Joint Corp.,<br><br>Defendant. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ernest Lee ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendant The Joint Corp., ("The Joint" or "Defendant"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. And when a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly transmits that data anyway, the misconduct is especially egregious.

2. Joint Corp., operates a commercial website, https://thejoint.com/ (the "Website"), through which users learn about chiropractic services, locate clinic locations, schedule appointments, purchase memberships and treatment plans, and explore promotional offers. Like many modern websites, the Website displays a cookie banner and a cookie preferences interface (the "Cookie Preferences Interface") purporting to give users meaningful control over what data the Website collects or otherwise discloses to third parties (the "Tracking Entities") via software-based monitoring systems (the "Tracking Tools") embedded on the Website. Defendant's cookie banner assures users that they may control the sale or disclosure of their personal information, including deactivating all non-essential cookies.




*Figure 1 – Cookie settings of The Joint representing that users could change tracking behavior through Cookie Preferences Interface*

3. Defendant's assurances are false. Cookie settings are deceptive and legally actionable where a website (1) begins placing and transmitting Tracking Tools before users have the ability to interact with the cookie banner, and (2) continues transmitting user data to Tracking Entities even after users toggle off the sale/sharing of personal information and reject all non-essential cookies. These practices plausibly constitute intrusion upon seclusion, and fraud, at a minimum.

4. The Website begins placing and transmitting Tracking Tools, including cookies, the moment a user lands on any page, well before the user can view or act upon the cookie banner. The Website deploys and transmits data via the Tracking Tools to the Tracking Entities. Upon information and belief, these Tracking Entities include Google, Meta (also referred to as "Facebook"), and additional advertising technology partners whose Tracking Tools, including cookies and "pixels," track users' browsing activities, Website interactions, inputs, device information, session data, and unique identifiers across the Website the moment users interact with the Website, load webpages, or otherwise trigger the events being monitored by the Tracking Tools. Even after users affirmatively toggle off the sale/sharing of personal information and reject all non-required cookies, the Website continues to deploy the Tracking Tools, allowing the Tracking Entities, such as Google and Reddit, to access, duplicate, and send to themselves communications between users and the Website via the Tracking Tools.

5. In short, the Website's cookie banner and preferences interface materially mislead users about the use and sale of users' data. Defendant lulls users into a false sense of privacy and control while simultaneously enabling third-party Tracking Entities to monitor users' online behavior in real time.

6. Plaintiff visited the Website, most recently in August 2025, to manage his monthly subscription for chiropractic services obtained from

Defendant. Plaintiff clicked "Manage Preferences" toggled off the sale/sharing of personal information, declined all non-necessary cookies, and selected "Save." In reliance on Defendant's representations, Plaintiff believed that the Website would modify its behavior in honor of Plaintiff's choices. Instead, Defendant continued to provide access to Plaintiff's browsing activity, page interactions, navigation patterns, and identifiers to the Tracking Entities for advertising and analytics purposes.

7. Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiff's sensitive information, private communications, invade Plaintiff's fundamental right to privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so, Defendant violated The Federal Wiretap Act 18 U.S.C. § 2710, et seq., California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); as well as common-law prohibitions against intrusion upon seclusion, fraud and deceit, unjust enrichment, and related statutory and common-law protections. Plaintiff brings this action on behalf of himself and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

9. This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintain its principal place of business in this District.

10. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

11. Plaintiff Ernest Lee is a resident and citizen of California. Plaintiff is and has been genuinely interested in the services and information offered through Defendant's Website and used the Website for its intended purpose. Specifically, Plaintiff accessed the Website frequently throughout 2025 to manage his monthly subscription for chiropractic services obtained from Defendant, book appointments, locate Defendant's clinic locations, and obtain information regarding Defendant's services and promotions. Plaintiff accessed the Website on the same devices and through the same web browser that he used to access social media platforms and third-party websites, including Meta (Facebook and Instagram), Google-operated services, and other digital social and advertising platforms. Plaintiff was physically located in California at all relevant times while accessing and using the Website. Plaintiff visited the Website in August, 2025, causing his personal information, including browsing activity and device identifiers, to be intercepted and recorded by certain Tracking Tools and Tracking Entities the moment he communicated with the Website, despite the presence of a cookie banner that assured users that tracking would not continue. When Plaintiff visits websites, his preference is to decline all non-essential cookies. When Plaintiff visited the Website, he recollects using the cookie banner to attempt to decline all non-essential cookies. Plaintiff more recently visited the Website on January 7, 2026, in connection with the investigation of this

case, and confirmed disabling the Tracking Tools on the Website by using the cookie banner to verify the decline of all non-essential cookies. Despite Defendant's assertions to the contrary, choosing to decline all non-essential cookies did not disable all the Tracking Tools. Some of the Tracking Tools, including those from Google, continued to monitor Plaintiff after he chose to reject non-essential cookies. As a result of Defendant's implementation of the Tracking Tools on the Website, and Defendant's fraudulent statements in the cookie banner, Plaintiff's personal information, including browsing activity, cookie identifiers, and device identifiers, was intercepted and recorded by certain Tracking Tools and Tracking Entities.

12. Defendant The Joint Corp. is a publicly traded company and is in the business of developing, operating, and franchising chiropractic clinics throughout the United States. Defendant operates through a network of both corporate-owned and franchised clinics under The Joint Chiropractic brand and provides administrative, operational, technological, marketing, and support services to The Joint Chiropractic brand and its franchisees. The Joint Corp. centrally operates, controls, and supports the marketing and commercial operations of its clinics to consumers nationwide, using digital platforms, including the Website. The Joint Corp. is incorporated under the laws of the State of Delaware and maintains its principal place of business in Scottsdale, Arizona, United States.

## **FACTUAL ALLEGATIONS**

### A. How Websites Function

13. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

14. Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

15. Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

16. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

17. An IP address is "a unique address that identifies a device on the internet or a local network."[4] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

18. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan 07, 2026).

[2] *Id.*

[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan 07, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan 07, 2026).

request, it issues a response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[5]

19. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

20. The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:




*Figure 2 - Mozilla's diagram of a URL, including parameters*[7]

21. Website owners or web developers write and manage the URLs for their websites.

22. URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

---

[5] *Id.*

[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[7] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan 07, 2026).

[8] *Id.*

23. The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

24. URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:




*Figure 3 – Demonstrating URL encoding and decoding*[12]

[9] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan 07, 206).
[10] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan 07, 2025).
[11] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan 07, 2025).
[12] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Dec. 22, 2025).




*Figure 4 – Sample webpage used to demonstrate a webpage URL*




*Figure 5 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*




*Figure 6 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

25. After the user sends the Request URL, the server sends the HTTP Response to the user, and the user's browser assembles the HTTP Response packets

into the source code of the webpage. The webpage code is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML, CSS, and JavaScript code.[13] This is the visible, and usually interactable, website that most people think of.

26. To provide more complex website functionalities, website developers will include more complex commands written in non-HTML computer programming languages such as JavaScript snippets, which are embedded or called within the HTML code.[14]

27. Such complex tasks include scheduling appointments or monitoring and reporting user activity.

28. In short, the Internet relies on a constant back-and-forth stream of requests being sent between the user and servers.

29. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up users' communications with the Website.

**B. Defendant Programmed the Website to Include the Tracking Tools**

30. Defendant voluntarily integrated Tracking Tools from various Tracking Entities into the Website's programming. Defendant's use of Tracking Tools on the Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities.

31. The Website, by using the Tracking Tools, causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are

---

[13] *How the web works?*, MOZILLA, How_the_web_works (last visited Jan 09, 2025).

[14] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan 07, 2026).

small text files sent by the Tracking Entities' and Website's servers to a user's web browser and stored locally on the user's device. Targeting, analytics, and advertising cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically harvested by the Tracking Tools and transmitted back to web servers through HTTP requests when users trigger the Tracking Tools, allowing the Website and Tracking Entities to identify the device and user communicating with the Website and to record how the user interacts with the Website.

32. First-party cookies are those placed directly on the user's device by the Website, which the user is knowingly communicating with. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

33. Third-party cookies are placed by third-party servers, not the Website, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded Tracking Tools, the Tracking Entities' scripts determine whether their cookies already exist on the user's device and, if not, cause those cookies to be created and stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

34. As detailed further below, cookies that are placed on users' devices during interactions with the Website are used to intercept and record users' communications for the Tracking Entities, including, but not limited to, information reflecting users' browsing and visit activity, such as webpages viewed, URLs, titles, keywords, time spent on pages, navigation paths, and the frequency and recency of visits to the Website, as well as session-level details including timestamps, duration,

and actions taken during Website visits, and referring URLs identifying the Website or platform directing the user to the Website.

35. This tracking further captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by users, location data and inferred interests, preferences, age, location, or characteristics derived from user behavior and content engagement. In addition, the information collected includes device and technical identifiers such as device type, operating system, browser type, and related identifiers; persistent user identifiers enabling recognition of users across sessions and websites; and approximate geolocation data derived from IP addresses or other signals. Collectively, this information is referred to herein as "Sensitive Information."

36. Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, cookies enable Defendant and the Tracking Entities to enhance revenue and marketing effectiveness through the collection, analysis, and dissemination of user data.

37. Defendant owns and operates the Website, which allows users to view The Joint's chiropractic services, locate clinic locations, explore promotions and membership offerings, and schedule appointments. When users interact with the Website by navigating pages, clicking links, entering data, or submitting information, they transmit Sensitive Information directly to Defendant.

38. Defendant chose to integrate the Tracking Tools into the Website. As a result, when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or transmitted to Tracking Entities' servers. Because

Defendant controls the Website's software code and determines which Tracking Tools are loaded, Defendant has complete control over whether these cookies are placed and whether user data is transmitted to Tracking Entities.

39. Defendant explains its use of third-party cookies on the Website's Cookie Preferences Interface by stating, in substance, that they may use cookies for analytics, personalization, and targeted advertising.

40. The Cookie Preferences Interface further represents that some "cookies" are required for basic functionality of the Website, and some cookies serve other purposes, and disabling cookies may impact user experience.

> "When you visit websites, they may store or retrieve data about you using cookies and similar technologies ("cookies"). Cookies may be necessary for the basic functionality of the website as well as for other purposes. You have the option of disabling certain types of cookies, though doing so may impact your experience on the website."[15]

41. Defendant provides additional disclosures regarding its use of third-party cookies in its Privacy Policy. In the section addressing "Use Of Information" Defendant informs users that certain third parties providing advertising services may collect or receive information about users' interactions with the Website through cookies and similar technologies, and that such information may be combined with data collected across different websites to deliver more relevant advertising.

> "We may use third-party service providers to process and store personal information in the United States and other countries.

---

[15] The Joint's cookie consent preference (under storage preferences) window as it was available when Plaintiff opted out of cookies and tracking technologies on the Website.

> We also use the cookies and other types of tracking technologies discussed above to participate in interest-based advertising, online behavioral advertising, retargeting, and remarketing. We may use or participate in advertising networks and related advertising services that are managed and provided by third-party advertising servers, advertising agencies, technology vendors, and research firms, which will require our use of these third-party tracking technologies on the Platform. These third parties collect information about your visits to and interactions with the Platform and other websites and apps and will use that information to target advertisements for goods and services. The information collected may personal information and may otherwise be associated with your personal information. These targeted advertisements may appear on the Platform or on other websites. Information on your options for these advertisements and additional information on the ad networks we use is below."[16]

42. In the section addressing 'Personal Information We Automatically Collect from Your Use of the Platform', Defendant further explains that it and Tracking Entities use cookies, or similar technologies, to enhance internet-based advertising.

> "The Site and App uses third-party analytics tools (e.g., Google Analytics and Firebase) and the cookies and other tracking technologies they provide to collect and process data about your use of the Platform, including when you visit the Platform, URLs of the websites that you visit prior to visiting the Platform and when you visit those websites, IP addresses and device IDs assigned to the devices from where you access the Platform, as well as mouse clicks, mouse movements, scrolling activity, and information you type into the Platform."[17]

---

[16] The Joint, *Privacy Policy*, https://www.thejoint.com/privacy-policy (last visited Jan 07, 2026).
[17] *Id.*

## C. Defendant Falsely Informed Users That They Could Opt Out of the Website's Use of Cookies

43. When users located in California visited the Website, the Website immediately displayed a pop-up cookie consent banner. The banner informed users that the Website "uses cookies" and that information about users' interactions with the Website is shared with social media, advertising, and analytics partners. The banner further presented users with the option to accept cookies or to manage their Cookie Preferences.




*Figure 7 – Cookie Banner of The Joint representing a "manage preferences" interface to accept or manage' Cookie Preferences"*

44. Website users who selected the "Manage Preferences" option were presented with a Cookie Preferences Interface pop-up, which represented that users could control how their Sensitive Information was collected, used, sold, or shared by adjusting toggles related to targeted advertising, selling, or sharing of personal information, consistent with applicable law.

45. After clicking to expand the Cookie Preferences Interface section addressing the sale or sharing of personal information and targeted advertising, Defendant represented to users, in substance, that they could exercise their right to opt out of the sale or sharing of personal information by using the toggle switch, and that if users opted out, Defendant would not provide personalized advertising and would not hand over users' personal information to Tracking Entities.




*Figure 8 – Cookie Preferences Interface representing users with an option of disabling the selling of user information and targeted advertising*

46. After users moved the toggle to indicate their choice to disable the sale or sharing of their personal information and to decline all non-essential cookies other than those strictly necessary and clicked "Save", users were permitted to continue browsing the Website. At that point, the cookie banner and the Cookie Preferences Interface window disappeared.

47. Defendant's Cookie Preferences Interface led Plaintiff, and all Website users similarly situated, to believe that they had successfully disabled the sale or sharing of their information and all non-essential cookies. The banner and preference window further reasonably led users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' Sensitive Information with the Website including their browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—after users exercised their control over disabling the Tracking Tools.

48. These representations were false. In reality, Defendant did not abide by users' expressed preferences. When users moved the toggles to opt out of the sale or sharing of their personal information and to reject all non-essential cookies, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Nevertheless, Defendant continued to cause the Tracking Tools, specifically those from Google and Reddit, to be placed on users' browsers and devices and/or transmitted to Tracking Entities, together with user data.

49. Specifically, even after users opted out of the sale or sharing of their personal information and declined all non-essential cookies, Defendant continued to cause Tracking Tools, including cookies, to be placed on users' devices and/or

transmitted to Tracking Entities, resulting in the real-time collection of user data that disclosed Website users' Sensitive Information. This included, without limitation, browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even after users attempted to protect their privacy by rejecting the use of Tracking Tools, Defendant continued to transmit users' Sensitive Information to Tracking Entities.

50. Certain aspects of the operation of cookies and Tracking Tools on the Website can be observed using website developer tools that log network traffic transmitted to and from a user's device while interacting with the Website.

51. Network traffic logs generated through such tools reveal HTTP requests and transmissions between users' browsers and multiple Tracking Entities while users visit and interact with the Website.




*Figure 9 – Screenshot depicting Developer Tool on user's browser showing network activity for Google third-party cookies*




*Figure 10 - Screenshot depicting Developer Tool on user's browser showing the payload activity Google third-party cookies*




*Figure 11 - Screenshot depicting Developer Tool on user's browser showing Google third-party cookies*




*Figure 12 - Screenshot depicting Developer Tool on user's browser showing network activity for Reddit third-party cookies*




*Figure 13 - Screenshot depicting Developer Tool on the user's browser showing Reddit third-party cookies*

52. These network logs demonstrate that, even after users rejected non-essential cookies and opted out of the sale or sharing of their personal information, users' browsers continued to send HTTP requests to Tracking Entities, such as Google and Reddit, and otherwise used non-essential cookies to track users.

53. Through these ongoing transmissions, Website users' Sensitive Information, including browsing history, visit history, interactions, inputs, session data, identifiers, and device-level information were surreptitiously disclosed to

Tracking Entities. These Tracking Tools enable Tracking Entities to track users across websites, and over time, correlate user behavior with other datasets, and compile detailed user profiles reflecting users' preferences, behaviors, demographics, and inferred characteristics. These profiles are monetized for advertising, analytics, and marketing purposes.

54. The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as unlawful wiretaps because they enable Tracking Entities, who are not parties to the communications, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. These Tracking Entities are not mere passive tools or instruments of the Defendant; they independently collect and use the intercepted communications for their own commercial purposes, in addition to benefits provided to Defendant.

**D. Defendant's Website Uses Tracking Tools to Spy on Users.**

55. Defendant operates the Website and has installed on the Website software created by Tracking Entities. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

56. The Tracking Tools collect information about users' site activity when events specified by the Defendant, like viewing a specific webpage, are triggered. Defendant determines just how much data is collected by the Tracking Entities, and how specific that data is, which can be seen in the parameters included in the detailed URLs and the metadata found in the payload of HTTP Requests.

57. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value":

---

[18] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Jan 07, 2026).

a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)




*Figure 14 - Diagram of a URL displaying how parameters function*[19]

### *a. The TikTok Pixel*

58. TikTok offers software – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

59. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their

[19] *Id.*

websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[20]

60. Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 14* and *16*—the TikTok javascript code in *Figure 14* references Defendant's Pixel ID, whereas the "code" variable in *Figure 17* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "C95LRLRC77U5U5HVQCIG".

61. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loads onto a user's browser), the value of the purchase, and the product purchased.[21]

62. These events, when triggered, cause the relevant data to be sent to TikTok via the TikTok Pixel as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

63. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a user);

---

[20] *See generally Troubleshoot with Pixel Helper*, TikTok, *https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en* (last visited Jan 07, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

[21] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Jan 07, 2026) (describing how to designate events).

c. Device information, including make, model, operating system, and browser information);

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[22]

64. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are and how they navigate around the Website.

65. TikTok's "Advanced Matching" feature allows TikTok to "match customer information such as email and phone number along with actions people take on [the Website]."[23] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[24] TikTok then provides Defendant with detailed marketing profiles of its users, including custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[25] Lookalike audiences provided by TikTok allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[26]

---

[22] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (Jan 07, 2026).

[23] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Jan 07, 2026).

[24] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Jan 07, 2026).

[25] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Jan 07, 2026) (benefits of using the TikTok Pixel).

[26] *See How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May

66. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[27]

67. Defendant used the TikTok Pixel to allow TikTok to monitor and log, in real time, when users clicked on specific links, loaded webpages, and viewed certain content.

68. The TikTok Pixel also captures users' identifying cookies (for example, the _ttp cookie is used to identify TikTok users[28]).

69. Plaintiff had a reasonable expectation that: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in Defendant's services, and (iii) Plaintiff's IP address and who Plaintiff was communicating with to obtain the products would not be exposed to the Tracking Tools placed by Defendant.

70. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[29]

---

2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Jan 07, 2026).

[27] *Id.*

[28] *See* https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Jan 07, 2026)

[29] *See Benefits of using the TikTok Pixel*, TIKTOK, (Sept. 6, 2025) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Jan 07, 2026).

71. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services and to generate its own benchmarking reports to share with other TikTok business customers.[30]

72. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information, and details about users' personal health."[31] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[32]

73. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[30] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Jan 07, 2026).

[31] *See Aaron Katersky*, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Jan 07, 2026).

[32] *Id.*




*Figure 15 – Home page of Website*




*Figure 16 – Using a browser's "developer tools" on The Joint's webpage shows the Website loading TikTok Pixel's code onto the user's browser*

Headers Payload Preview Response Initiator Timing Cookies

```
window[window["TiktokAnalyticsObject"]]._env = {
    "env": "external",
    "key": ""
};
window[window["TiktokAnalyticsObject"]]._variation_id = 'traffic_1::default';
window[window["TiktokAnalyticsObject"]]._vids = '74172070,74539884,74813232';
window[window["TiktokAnalyticsObject"]]._cc = 'US';
window[window.TiktokAnalyticsObject]._li || (window[window.TiktokAnalyticsObject]._li = {}),
window[window.TiktokAnalyticsObject]._li["C95LRLRC77U5U5HVQCIG"] = "e6eb5734-e820-11f0-b9f4-b8cef6727490";
window[window["TiktokAnalyticsObject"]]._cde = 390;
;if (!window[window["TiktokAnalyticsObject"]]._server_unique_id)
    window[window["TiktokAnalyticsObject"]]._server_unique_id = 'e6eb6931-e820-11f0-b9f4-b8cef6727490';
window[window["TiktokAnalyticsObject"]]._plugins = {
    "AdvancedMatching": true,
    "AutoAdvancedMatching": true,
    "AutoClick": true,
    "AutoConfig": true,
    "Callback": true,
    "DiagnosticsConsole": true,
    "EnableLPV": true,
    "EnrichIpv6": true,
    "EnrichIpv6V2": true,
    "EventBuilder": true,
    "EventBuilderRuleEngine": true,
    "HistoryObserver": true,
    "Identify": true,
    "JSBridge": false,
    "Metadata": true,
    "Monitor": false,
    "PageData": true,
    "PerformanceInteraction": false,
    "RuntimeMeasurement": true,
    "Shopify": true,
    "WebFL": false
};
window[window["TiktokAnalyticsObject"]]._csid_config = {
    "enable": true
```

*Figure 17 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

74. The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the screenshots below, the sample webpage being viewed is depicted, along with the webpage code showing the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to its collection of user behavior:




*Figure 18 – Sample product on the Website*

Headers Payload Preview Response Initiator Timing Cookies
Request Payload View source
{event: "Pageview", event_id: "",…}
context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
ad: {sdk_env: "external", jsb_status: 2}
csct: 2
csid: "1767388793786::nKtnrs3NNfxwPycoztV3"
device: {platform: "pc"}
library: {name: "pixel.js", version: "2.2.1"}
page: {url: "https://thejoint.com/california/palmdale/palmdale-31235",…}
load_progress: "1"
referrer: "https://thejoint.com/locations"
url: "https://thejoint.com/california/palmdale/palmdale-31235"
page_csid: "1767388793787::F2XwWQ_Yg92xFy5X4heh"
pageview_id: "c7b029b9-e820-11f0-85cf-be837dddf1c1-rMwdy.3.0::e6eb5734-e820-11f0-b9f4-b8cef6727490-C95LRLRC77U5U5HVQCIG"
pixel: {code: "C95LRLRC77U5U5HVQCIG", runtime: "1"}
code: "C95LRLRC77U5U5HVQCIG"
runtime: "1"
session_id: "c7b029b9-e820-11f0-85cf-be837dddf1c1::nOQ461hxAQ80jpfut0Hq-C95LRLRC77U5U5HVQCIG"
user: {anonymous_id: "01KE05K752B3VMGFXZT23VHV8H_.tt.1", external_id: "176738879266376159"}
anonymous_id: "01KE05K752B3VMGFXZT23VHV8H_.tt.1"
external_id: "176738879266376159"
userAgent: "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36"
variation_id: "traffic_1::default"
event: "Pageview"
event_id: ""
is_onsite: false
message_id: "messageId-1767388848459-8998447191555-C95LRLRC77U5U5HVQCIG"
partner: "GoogleTagManagerClient"
properties: {}
signal_diagnostic_labels: {raw_email: {label: "missing"}, raw_auto_email: {label: "missing"}, raw_phone: {label: "missing"},…}
timestamp: "2026-01-02T21:20:48.459Z"
_inspection: {,…}


*Figure 19 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 16*

75. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

76. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[33]

77. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[34]

---

[33] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Jan 07, 2026).

[34] *Id.*

78. TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[35] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

79. TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[36]

80. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their private information.

***b. The Facebook Pixel***

81. Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

82. The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Pixel.[37]

---

[35] *Id.*

[36] *Id.*

[37] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Dec. 22, 2025).

83. Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[38] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[39]

84. This Pixel ID must match "a known Pixel ID" in Meta's system,[40] and is transmitted by the Meta Pixel.[41]

85. As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[42]

86. Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[43] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[44]

---

[38] *Id.*

[39] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan 07, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[40] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan 07, 2026)

[41] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan 07, 2026).

[42] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan 07, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[43] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan 07, 2026).

[44] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan 07, 2026).

87. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[45]

88. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

89. When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[46] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

90. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 20– Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

91. The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 18*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

[45] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan 07, 2026).

[46] *Cookies Policy: What are cookies, and what does this* policy cover?, *Facebook* (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan 07, 2026).




*Figure 21 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

92. The Pixel tracks user-activity on web pages by monitoring events,[47] which, when triggered, causes the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[48] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView

---

[47] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan 07, 2026).

[48] *See generally id.*

event");[49] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event)[50]. The Website utilizes these two pixel events.[51]

93. Defendant's use of the Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel IDs of "1665277417065941", "8629396804531438", and "3975220449387180".

94. Defendant uses the Facebook Pixel to monetize its Website users' Sensitive Information.

95. Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

96. Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 15*.

---

[49] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan 07, 2026).

[50] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Jan 07, 2026).

[51] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Jan 07, 2026).




*Figure 22 – Facebook Pixel tracking a user landing on the webpage from Figure 16 through the "ViewContent" event*




*Figure 23– Facebook Pixel tracking a user landing on the webpage from Figure 16 through the "PageView" event*

97. When a business applies with Facebook to use the Facebook Pixel, it is provided details about its functionality, including with respect to private information.[52]

98. To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

99. The Facebook Terms inform website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with

[52] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan 07, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

Facebook, through the automatic sharing of Pixel Event information and contact information.[53]

100. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[54]

101. Facebook directs parties implementing the Facebook Pixel -here, Defendant - to encrypt request information[55] *before* data can be shared.[56]

102. Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

103. Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[57]

104. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy

---

[53] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan 07, 2026).

[54] *Id.*

[55] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[56] *Id.*

[57] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan 07, 2026).

violations that would result from use of the Facebook Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

***c. Google Tracking Tools***

105. Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

***1. Google Ads***

106. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[58]

107. The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[59] (iii) Google then allows advertisers to bid on those various keywords;[60] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

108. Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[61] The search terms bid on through

[58] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Jan 6, 2026).

[59] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Jan 07, 2026).

[60] *Id.*

[61] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan 6, 2026).

Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

109. AdSense for content or AdSense for search are methods by which AdSense functions.[62] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

110. Google Ads intercepted Plaintiff's viewing activity, as depicted below, using the sample webpage for "California Palmdale" on the Website.




*Figure 24 – Test search made on the Website resulted in sharing Content Views with Google Page Ads*

111. Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

112. Through Google AdSense, Google aggregates viewing data collected from website users. Google uses that data to improve its services and deliver more

---

62 *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan 07, 2026).

relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

113. Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[63] Google uses data on how users interact with websites to train its algorithms to provide more accurate and relevant search results.[64] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[65]

114. Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user viewing data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of data.

### ***2. Google Analytics***

115. Like the Facebook Pixel, Google Analytics ("GA") collects data about user interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or

[63] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan 07, 2026).
[64] *Id.*
[65] *Id.*

removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[66]

116. GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[67] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[68]

117. GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for user disclosure to website developers, including Defendant.

118. Here, Defendant added GA to the Website. That implementation caused Plaintiff's webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

[66] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan 07, 2026).

[67] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan 07, 2026).

[68] *Id.*




*Figure 25 – Test search made on the Website resulted in sharing search terms with Google Analytics*

119. After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

### *d. The Reddit Pixel*

120. Additionally, Defendant has installed a tracking pixel on its Website created by social media platform Reddit (the "Reddit Pixel").

121. The Reddit Pixel is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions the visitors take.[69] The harvested data is subsequently used by the website owner to serve targeted ads to website visitors on Reddit.

[69] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Dec. 22, 2025); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Jan 07, 2026).

122. The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that visitors take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[70]

123. Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[71] and to specify "which business account should receive" the user's tracking data.[72]

124. In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_ggk9trqk3ue3". This data is sent both when receiving communications from the Website and as users send communications to the Website.

125. Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the Website.

126. Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[73]

---

[70] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Jan 07, 2026).

[71] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Jan 07, 2026).

[72] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Jan 07, 2026).

[73] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Jan 07, 2026).

127. In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website visitors.[74]

128. IP addresses are match keys website owners are *required* to send to Reddit, while other match keys may be used, including:

- Email addresses;
- Phone numbers;
- Mobile Advertising IDs (a unique identifier for a mobile user);
- Reddit Click IDs (to attribute click conversions more accurately);
- External IDs (an advertiser-assigned identifier that enhances match accuracy);
- Reddit UUIDs (a unique ID generated by the Reddit Pixel);
- User Agents (which identifies the software the user is using to access the website); and
- The visitor's screen dimensions.[75]

129. This data can be used by Reddit to match an otherwise anonymous website visitors to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

130. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific ad campaigns, track visitors across devices, and help them create more precisely targeted ad campaigns.[76]

---

[74] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Jan 07, 2026).
[75] *Id*
[76] *Id.*

131. Additionally, Reddit employs this data to optimize their own ad placements and to develop new services.[77]

132. Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user viewing the Website.




*Figure 26 – Reddit Pixel tracking a user visiting the webpage from Figure 15*

133. To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

134. The Reddit Terms inform website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[78]

135. The Reddit Terms make clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

---

[77] *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4 (last visited Jan 07, 2026).

[78] *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Jan 07, 2026).

136. The Reddit Terms explicitly conditions the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[79]

137. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**E. The Tracking Tools are Pen Registers or Trap and Trace Devices.**

138. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but such information does not include the contents of any communication." Cal. Penal Code § 638.50(c).

139. California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but such information does not include the contents of any communication." Cal. Penal Code § 638.50(b).

140. The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic

[79] *Id.*

impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the Website is collaborating with the Tracking Entities to obtain their IP address and other identifying information. As such, it is a "trap and trace" device. *See Rodriguez v. Autotrader.com, Inc.*, No. 2:24-cv-08735-RGK-JC, 2025 WL 65409, at *5 (C.D. Cal. Jan. 8, 2025) (Klausner, J.).

141. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, it is designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiff's device to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiff's device.

142. Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

143. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2; *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

144. Defendant did not obtain Plaintiff's or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did the Defendant obtain a court order.

**F. Defendant Violated CIPA § 631 by Intercepting the Contents of Plaintiff's Communications**

145. CIPA § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024). Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts. *Id.*

146. Courts analyze claims under CIPA § 631 using the same framework applied to claims under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

***a. Defendant Procured Tracking Entities to Intercept the Contents of Communications in Transit***

147. Under federal and California wiretap law, the "contents" of a communication refer to the intended message conveyed by the communication, not merely record or routing information generated incidentally. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

148. Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute contents. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

149. Here, the network requests intercepted by the Tracking Entities included Request URLs containing the names of the webpages that users viewed on the Website.

150. The Tracking Tools intercepted the contents of Plaintiff's communications contemporaneously with Plaintiff's interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiff's browser and continued to transmit data at the moment Plaintiff submitted information through the Website.

151. This interception, duplication, and transmission occurred inside Plaintiff's browser, before the communications reached their intended destination, and therefore occurred while the communications were in transit. *See Esparza v. UAG Escondido A1 Inc.*, No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

152. The Tracking Entities were third parties to Plaintiff's communications with the Defendant and used the contents of Plaintiff's and Class Members' communications to build marketing profiles of them in real time..

153. Defendant's deployment of the Tracking Tools enabled those Tracking Entities to intercept Request URLs that specified the content Plaintiff accessed on the Website, in violation of CIPA § 631.

***b. Defendant Aided and Abetted Third-Party Interceptions***

154. A party violates CIPA § 631 not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

155. Defendant knowingly embedded and configured the Tracking Tools in a manner that enabled the Tracking Entities to intercept the contents of Plaintiff's communications with the Website.

156. Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept those communications.

157. Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

***c. Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls***

158. Plaintiff's investigation revealed that the Website's default settings permitted tracking to begin immediately, before users had any opportunity to review or act upon the cookie banner.

159. As a result, users were tracked as soon as they landed on the Website home page, without prior consent.

160. Plaintiff visited the Website while those default tracking settings were active.

161. Users who visit the Website are shown a cookie banner offering the option to accept only "necessary" cookies."




*Figure 27 – The Cookie Banner shown to users who visit the Website*

162. Despite those representations, even users who declined all unnecessary cookies continued to be tracked by Google and Reddit cookies.

163. Representations regarding cookie-consent controls are materially misleading where tracking continues despite users' opt-out selections.

164. Defendant and the Tracking Entities benefited from the interception of Plaintiff's communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiff's browsing habits and interests, and by using those profiles for targeted advertising.[80]

---

[80] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Jan 07, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan 07, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Jan 07, 2026).

165. The Tracking Entities independently benefit from the interception of communications by using data collected through the Tracking Tools to improve their own advertising products and to market those capabilities to other businesses.[81]

**CLASS ALLEGATIONS**

166. Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class (collectively "the Class"):

> All users who visited and interacted with the Defendant's website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

Plaintiff brings this class action individually and on behalf of the following California Subclass:

> All users who visited and interacted with the Defendant's website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "California Subclass").

167. Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant,

---

[81] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Jan 07, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan 07, 2026).

and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

168. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

169. NUMEROSITY: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by the Defendant.

170. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Class Members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

171. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by the Defendant, Plaintiff is asserting claims that are typical of the Class.

172. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

173. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, the Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
**Intrusion Upon Seclusion**
**(On behalf of Plaintiff and the Class)**

174. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

175. Plaintiff brings this cause of action on behalf of himself and all Class Members.

176. The tort of intrusion upon seclusion requires (a) an intentional intrusion into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy, and (b) that the intrusion be highly offensive to a reasonable person.

177. By causing the Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' opt-outs, Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class members.

178. Plaintiff and Class members had an objectively reasonable expectation of privacy in their Sensitive Information with the Website because Defendant represented that users could opt out of the sale/sharing of their personal information and opt out of non-essential cookies and Tracking Tools, and because California law protects such communications.

179. Defendant's intrusion, placing Tracking Tools and enabling Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking was highly offensive to a reasonable person.

180. As a direct and proximate result of Defendant's intentional intrusion, Plaintiff and Class members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## SECOND CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(On behalf of Plaintiff and the California Subclass)**

181. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

182. Plaintiff brings this cause of action on behalf of himself and all Class Members.

183. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious

threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

184. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

185. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

186. In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. Ribas v. Clark, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

187. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

188. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of the Defendant. Within the relevant time period, the Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

189. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

190. Plaintiff and California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

**<u>THIRD CAUSE OF ACTION</u>**
**Violation of the California Invasion of Privacy Act Cal. Penal Code § 638.51**
**(On behalf of Plaintiff and the California Subclass)**

191. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

192. Plaintiff brings this cause of action on behalf of himself and all Class Members.

193. California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

194. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

195. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." California Penal Code § 638.50(c).

196. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

197. California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a).

198. No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by the Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture the IP addresses, email, routing, addressing, and other signaling information of website visitors. The

Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

199. The Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff's and Class Members' activity on the Website.

200. The Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

201. As a direct and proximate result of Defendant's conduct, Plaintiff and California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

## FOURTH CAUSE OF ACTION
**Violation of The Federal Wiretap Act 18 U.S.C. § 2710, et seq.**
**(On behalf of Plaintiff and the Class)**

202. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

203. Plaintiff brings this cause of action on behalf of himself and all Class Members.

204. The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

205. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

206. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

207. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

208. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

209. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

210. Defendant is a "person" within the meaning of the Wiretap Act.

211. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

212. Plaintiff had a reasonable expectation of privacy in his electronic communications with the Defendant's Website, including his searches, browsing activity, and order-related interactions, particularly where the Defendant represented through its cookie banner, cookie-preference interface, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

213. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website such as searches, menu selections, and order interactions, are sensitive and convey the substance and meaning of the communication.

214. A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated illegally as a matter of course.

215. Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website.

216. Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiff's consent, for the unlawful purpose of monetizing Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the internet and used for advertising, analytics, and marketing optimization.

217. Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through his browser.

218. At all relevant times, the Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing

so would result in the interception and transmission of users' communications to Tracking Entities.

219. Plaintiff was never asked to consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiff affirmatively declined non-essential tracking through Defendant's cookie-preference interface.

220. The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

221. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

b. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c. reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
## Common Law Fraud, Deceit and/or Misrepresentation
## (On behalf of Plaintiff and the Class)

222. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

223. Plaintiff brings this cause of action on behalf of himself and all Class Members.

224. Defendant made affirmative representations to users through its cookie banner, cookie preferences interface, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

225. Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and analytics cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

226. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

227. These representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit user data to third parties.

228. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

229. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or

condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

230. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for their own commercial benefit.

231. Plaintiff and Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

232. Plaintiff's reliance was reasonable because Defendant presented the cookie banner and cookie preferences interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

233. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

234. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

235. Plaintiff and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**<u>SIXTH CAUSE OF ACTION</u>**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

236. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

237. Plaintiff brings this cause of action on behalf of himself and all Class Members.

238. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

239. Defendant's retention of those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent is unjust.

240. Plaintiff and Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

## SEVENTH CAUSE OF ACTION
**Violation of the California Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1770, et seq. ("CLRA")**
**(On behalf of Plaintiff and the California Subclass)**

241. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

242. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

243. Defendant is a person under the CLRA.

244. Plaintiff is a consumer of Defendant's services under the CLRA, as Plaintiff used Defendant's Website to obtain chiropractic treatments.

245. Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

246. By this failure to disclose, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

247. By this failure to disclose, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

248. Defendant's failure to disclose was material to Website visitors such as Plaintiff. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking

Tools and allowed them to be disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

249. Defendant undertook deceptive acts or practices, in violation of the CLRA, by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

250. By this fraud, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

251. By this fraud, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

252. Plaintiff and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**EIGHTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")**
**(On behalf of Plaintiff and the California Subclass)**

253. Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 165 as though fully set forth herein.

254. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

255. By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendant has violated the unlawful prong of the UCL.

256. By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

257. By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

258. By actively and fraudulently deceiving visitors about its ability to disable the tracking pixels, Defendant has violated the unlawful prong of the UCL.

259. Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed visitors' personal identifying information without knowledge or consent. Defendant disclosed visitors' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping visitors' communications with the Website. Defendant fraudulently deceived visitors about its ability to disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

260. Plaintiff has standing to bring claims against Defendant under the UCL. Plaintiff's information was tracked and recorded without consent. Plaintiff's data was used to build personal profiles for advertising purposes without consent.

261. Plaintiff would have considered it important to the decision to visit Defendant's Website to know that his data was being tracked and recorded without his consent.

262. Because of Defendant's UCL violations described above, Plaintiff suffered injury by losing control of his personal data and having his personal information tracked and recorded without his consent.

263. Plaintiff and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

a. For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

b. For an order declaring the Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

e. An award of statutory damages or penalties to the extent available;

f. For damages in amounts to be determined by the Court and/or jury;

g. For pre-judgment interest on all amounts awarded;

h. For an order of restitution and all other forms of monetary relief;

i. Reasonable attorneys' fees and costs; and

j. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: January 28, 2026

**ZIMMERMAN REED LLP**

By: *<u>/s/ Hart Robinovitch</u>*
Hart Robinovitch
14648 N. Scottsdale Rd., Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
Email: hart.robinovitch@zimmreed.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

*Attorneys for Plaintiff*

**pro hac vice* forthcoming